**FILED**
**CLERK**

7/22/2020 4:34 pm

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
RANDALL KNIGHT,

     Plaintiff,

     -v-

NASSAU COUNTY,

     Defendant.

-------------------------------------------------------X

Case No. 17-cv-0958 (SFJ)(SIL)
**Memorandum and Order**

FEUERSTEIN, S., Senior District Judge:

I.    Introduction

    Plaintiff Randall Knight ("Plaintiff" or "Randall") commenced this § 1983 action against Defendant Nassau County ( "Defendant" or "County"), alleging, *inter alia*, retaliation in violation of his First Amendment rights (*i.e.*, First Cause of Action), and violation of his due process rights enumerated and secured by the Fourteenth Amendment (*i.e.*, Second Cause of Action), as well as a retaliation claim pursuant to 42 U.S.C. § 1981 (*i.e.*, Fifth Cause of Action). (*See generally* Complaint (ECF No. 1); hereafter, "Complaint".)  Presently before the Court is the County's second motion seeking summary judgment in its favor on all of Plaintiff's claims[1] (hereafter, the "Motion") (*see* ECF No. 27; *see also* ECF No. 27-2 ("Support Memo")), which the Plaintiff opposes (hereafter, "Opposition" or "Opp'n")(*see* ECF No. 29).  For the reasons that follow, the County's Motion is GRANTED.

---

[1] Plaintiff originally brought five causes of action; he has since withdrawn his Third and Fourth Causes of Action.  (*See* January 18, 2019 Minute Entry (ECF No. 13).)  The County seeks summary judgment on Plaintiff's remaining causes of action, *i.e.*, his First, Second, and Fifth Causes of Action.

II.    Background

    *A. Factual Background*[2]

       1. Generally

Knight, a former New York City police officer, was a Nassau County probation officer from 2009 to 2015.  (*See* County Statement, ¶1; Additional Facts, ¶48.)  As an employee of County, Knight was: "a member of the collective bargaining unit, the Civil Service Employees Association, Inc. [(hereafter, the 'Association')," with the terms and conditions of his employment being subject to the collective bargaining agreement ("CBA") between the Association and the County (*see* County Statement, ¶2); and, "given a Code of Conduct to follow."  (*Id.* at ¶3.)  The County has an Equal Employment Opportunity Policy ("EEO Policy"), which: "states that the County will not tolerate discrimination and/or harassment;" "prohibits retaliation;" and, is distributed to all employees.  (*Id.* at ¶¶43, 45.)  "In furtherance of the EEO [P]olicy, the County implemented a complaint procedure for review of allegations of discrimination, harassment or retaliation."  (*Id.* at ¶44.)  Although, in this case, the Plaintiff

---

[2]  Unless otherwise indicated, the facts are taken from:

    (a) the County's Local Rule 56.1 Statement (hereafter, the "County Statement")(*see* ECF No. 27-1);
    (b) Plaintiff's Response to the County's Statement (hereafter, "Knight Statement")(*see* Opp'n, Part II, at 6-14);
    (c) Plaintiff's Additional Disputed Material Facts (hereafter, "Additional Facts") (*see* Opp'n, Part III, at 14-18 (including an additional 33 paragraphs of alleged facts)); and
    (d) the County's "Reply Statement" (*see* ECF No. 28-1).

Further, unless otherwise stated, a standalone citation to a Statement denotes that either the parties have, or the Court has, determined the underlying factual allegation to be undisputed. Citation to a party's Statement incorporates by reference the documents cited therein, if any. The County's exhibits are attached to the Declaration of Susan M. Tokarski (*see* ECF No. 27-3) and are identified by letters "A" through "H".  Knight's exhibits are attached to his Opposition and are identified by numbers "1" through "4".

alleges he made "at least three verbally complaints of racism" (*see* Knight Statement, ¶46), Knight "did not file an internal EEO complaint alleging discrimination." (County Statement, ¶46.)

     2.  <u>The Arroyo Incident</u>

On May 29, 2015, from 4:00 p.m. to 9:00 p.m., Knight was: "working in Long Beach, New York with his partner, Probation Officer Marta Del Valle [(hereafter, 'Del Valle')] conducting a 'DWI Sweep'" (hereafter, the "DWI Shift") (*id.* at ¶6; *see also* Additional Facts, ¶51); "driving an unmarked vehicle . . . with . . . Del Valle[] as his passenger" (*id.* at ¶7; *see also* Additional Facts, ¶52); and, "wearing a government marked jacket, bullet-proof vest, his holstered weapon, and his officer shield/badge." (Additional Facts, ¶52.)  Knight contends that just prior to their DWI Shift beginning, he met Del Valle at a donut shop and during that meeting complained to her about "systemic racism in law enforcement departments."  (*See* Additional Facts, ¶71; *cf.*, County Reply ("Defendants [*sic*] object to the allegations." (without citation)).)

At approximately 8:00 p.m. during the DWI Shift, Knight was "pulled over by . . . City of Long Beach Police Officer Judy Arroyo" (hereafter, "Arroyo") for running a red light.  (County Statement at ¶8.)  According to Knight, he "inadvertently, not intentionally, potentially ran a red light." (Additional Facts, ¶55 (citing Knight Depo. Tr. 17:24-18:13[3]).)  Arroyo did not exit her

---

[3]  In relevant part, Knight testified:

> A:     I made a left, and apparently there is a light there that I may not have seen and I proceeded to go up [the street] and [Arroyo] immediately pulled out and pulled to the side of my vehicle.
>
> Q:     So if I understand what you just said correctly, it may have been that you ran a light?
>
> A:     Possibly, yes, that I was unaware of.  I'm not from that area.  I am not familiar with the traffic lights.

car, but spoke to Knight through her patrol car window, which exchange was "combative." (*See* County Statement, ¶14; *cf.*, Knight Statement, *id.* at ¶14 (alleging Arroyo "was 'loud and yelling and screaming,' and therefore the 'combative' characterization Knight testified to applies also to Arroyo's behavior").)  The County asserts that, during this stop, Knight cursed at Arroyo and then "sped away without being given permission to leave." (County Statement, ¶13.)  Knight disputes these assertions relying upon his deposition testimony that "[Arroyo] stated that I ran a light.  I told her I did not run a light and we had words[.]  I am not sure of what was said, and then she didn't tell me I had to stay there, I'm under arrest or anything like that[.  S]o after the conversation ended[,] I pulled off and she pulled off." (Knight Depo. Tr. 19:17-23.)  (Hereafter, the "First Stop".)

Thereafter, "Arroyo followed [Knight] with her turret lights still on and again pulled over the vehicle." (County Statement, ¶15.)  (Hereafter, the "Second Stop"; together with the First Stop, the "Stops".)  "Upon immediately [being] pulled over, Officer Knight exited his vehicle as Officer Arroyo exited hers." (Additional Fact, ¶61.)  Failing to identify himself as a law enforcement officer, Knight approached Arroyo in an aggressive manner, causing her to adopt a defensive "blade stance" which involves placing one's hand on one's weapon. (County Statement, ¶¶16, 17.)  Thereafter, Del Valle exited the Crown Victoria, identified herself and Knight as County probation officers, and attempted to push Knight back into their vehicle. (*See id.* at ¶¶19, 21; *cf.*, Knight Statement, ¶21 (objecting because Knight testified that Del Valle could not have physically moved him).)  "Arroyo never issued—or attempted to issue—a ticket, citations, summons or any written reprimand whatsoever to either Officer Knight or . . . Officer Del Valle." (Additional Fact, ¶67.)

---

(Knight Depo. Tr. 18:2-12.)

### 3.  The Cubicle Incident and Related Events

When Knight arrived at work on the next business day, June 1, 2015, Del Valle had

submitted a report about the Arroyo Incident to her supervisor (hereafter, the "Del Valle

Report").  (*See* Additional Facts, ¶¶64, 69.)  Knight approached Del Valle at her cubicle to

question her about her Report, speaking to her "in a loud voice" while two other female

probation officers, Officers Mays ("Mays") and Torres ("Torres"), were present.  (*See* County

Statement, ¶¶23-27.)  He disputes the County's characterization of this being an angry

confrontation, during which he banged on Del Valle's cubicle, and which Del Valle, Mays, and

Torres found to be intimidating.  (*See* Knight Statement, ¶¶23-27; *see also* Additional Fact, ¶66

(stating "the conversation was 'short and brief'" during which Knight "did not use profanity . . .

[or] curse" and "'tap[ped]' the top of Officer Del Valle's cubicle" "upon leaving the brief

exchange").)

Knight further contends that, on or about June 1, 2015, he complained to Deputy Director

Stephen Goldberg ("Goldberg"), who has employment authority over Knight, about his belief

that Arroyo was a racist.  (*See* Additional Fact, ¶¶71, 73.)  Goldberg was tasked with

investigating the Arroyo Incident.  (*See id.* at ¶74.)  In so doing, Goldberg did not ask Knight for

his version of what occurred during that Incident until June 29, 2015.  (*See id.*; *see also* County

Statement, ¶28.)

### 4.  The Termination Meeting

On June 29, 2015, Knight had a meeting with Deputy Director Goldberg, Dominic

DiMaggio ("DiMaggio"), a Deputy County Attorney in charge of personnel, and others.  (*See,

e.g.*, Additional Facts, ¶¶68, 79; County Statement, ¶ 28, 30.)  At that meeting, Knight was

presented with a Notice of Personal Action ("NOPA") which levied six charges against him

5

arising out of his conduct during the Arroyo Incident, including a charge of "[b]ehavior unbecoming of an Officer, and which formed the basis for his being terminated. (*See* County Statement, ¶¶ 29, 30, 35, 36; *see also* NOPA, Ex. H (ECF No.27-11).) During this meeting, Knight told Goldberg that Arroyo was a racist. (*See id.* at ¶34; *see also id.* at ¶28; Additional Facts, ¶78, 79.) Knight was terminated on June 29, 2015. (*See* NOPA, Part 1.)

### 5. The Arbitration

Knight challenged his termination in accordance with the CBA, which ultimately led to binding arbitration. (*See* County Statement at ¶¶31-33; *see also* CBA, Ex. A (ECF No. 27-4), §§ 10-8, 10-9; Arbitration Decision, Ex. F (ECF No. 27-9) at 2 ("After the parties were unable to resolve the matter through the grievance process, [an arbitrator] was selected to hear and decide the matter.").) Knight: "attended a three-day hearing before an impartial arbitrator at which he testified, presented evidence, cross-examined witnesses and offered arguments through Counsel" (*id.* at ¶37); "was represented by Counsel" (*id.* at ¶38) and "the Assistant to the President of his Union, and the President and Vice President of his Unit within the Union, and an additional representative of his Union" (*id.* at ¶39); and, testified at the arbitration hearing "before a neutral and impartial arbitrator," as did Arroyo, Del Valle, Mays, and Torres (*id.* at ¶40). While Knight maintains "that the arbitrator did not consider the claims contained in the present lawsuit," it is undisputed that "[a]fter a deliberate and thorough process, the Arbitrator found Plaintiff guilty of misconduct and behavior unbecoming of an officer" (*cf.*, County Statement, ¶41, *with* Knight Statement, ¶41) and that "[t]he Arbitrator's decision was solely based on the evidence presented at the hearing, and the [A]rbitrator presented a comprehensive and detailed record of the evidence presented as well as written findings of fact and reasons for his decision." (*cf.*, County

Statement, ¶42, *with* Knight Statement, ¶42; *see also* Arbitration Decision.)  The Arbitrator's

decision was issued February 16, 2016.  (*See* Arbitration Decision at 30.)

### B.  Procedural Background

On February 21, 2017, Plaintiff commenced this action, alleging that he was retaliated

against by the County when it conducted a constitutionally inadequate internal investigation that

led to his subsequent termination as a probation officer as a result of his complaints of racial

profiling directed at him.  (*See* Complaint.)  On April 27, 2017, the County answered the

Complaint, denying Knight's allegations and raising several affirmative defenses.  (*See* Answer

(ECF No. 9).)

In August 2019, the County's initial summary judgment motion (*see* ECF No. 17) was

denied without prejudice.  *See Knight v. County of Nassau*, No. 17-cv-958, 2019 WL 3817392, at

*5 (E.D.N.Y. Aug. 14, 2019).[4]  On December 4, 2019, the County filed the instant Motion

together with, *inter alia*, its Local Rule 56.1 Statement.  Knight's Opposition included a section

responding to the County Statement in his Opposition (*see* Opp'n, Part II, at 6-14), which the

Court construes to be Knight's Local Rule 56.1 Counterstatement, as well as another section

containing an additional thirty-three paragraphs of alleged facts (*see id.*, Part III, at 14-18).  The

County addressed Knight's Additional Facts in its Reply Statement.

III.   Discussion

### A.  The Summary Judgment Motion Standard

"Summary judgment is proper 'if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law.'"  *ING Bank N.V. v.*

*M/V TEMARA, IMO No. 9333929*, 892 F.3d 511, 518 (2d Cir. 2018) (quoting Fed. R. Civ. P.

---

[4]  The Court's Memorandum and Order is ECF No. 25 in the Case Docket.

56(a)); *accord Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018).  In ruling on a summary

judgment motion, the district court must first "determine whether there is a genuine dispute as to

a material fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184,

202 (2d Cir. 2007) (internal quotations and citations omitted); *see also Ricci v. DeStefano*, 557

U.S. 557, 129 S. Ct. 2658, 2677 (2009) ("On a motion for summary judgment, facts must be

viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as

to those facts." (emphasis added; internal quotations and citation omitted)).

In reviewing the record to determine whether there is a genuine issue for trial, the court

must "construe the evidence in the light most favorable to the non-moving party," *Centro de la*

*Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017)

(quotations, alterations and citation omitted), and "resolve all ambiguities, and credit all factual

inferences that could rationally be drawn, in favor of the party opposing summary judgment."

*Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 45 (2d Cir. 2019) (quotations and citation

omitted); *see also Hancock v. County of Rensselaer*, 823 F.3d 58, 64 (2d Cir. 2018) ("In

determining whether there is a genuine dispute as to a material fact, we must resolve all

ambiguities and draw all inferences against the moving party.").  "Where the record taken as a

whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine

issue for trial." *Ricci*, 557 U.S. at 586 (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986)); *accord Baez v. JetBlue Airways Corp.*, 793

F.3d 269, 274 (2d Cir. 2015).

"The moving party bears the initial burden of showing that there is no genuine dispute as

to a material fact." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d

Cir. 2013) (quotations, brackets and citation omitted); *accord Jaffer*, 887 F.3d at 114.  "[W]hen

the moving party has carried its burden[,] . . . its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . [,]" *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769 (2007) (quoting *Matsushita Elec.*, 475 U.S. at 586-87), and must offer "some hard evidence showing that its version of the events is not wholly fanciful[.]" *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008) (quotations and citation omitted).  The nonmoving party can only defeat summary judgment "by adduc[ing] evidence on which the jury could reasonably find for that party." *Lyons v. Lancer Ins. Co.*, 681 F.3d 50, 56 (2d Cir. 2012) (quotations, brackets and citation omitted).  Since "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party[,] . . . [i]f the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)(quotations and citations omitted).

     *B. The Instant Case*

         1. <u>Consideration of the Arbitration Decision</u>

              (*a.*) *Relevant Case Law*

Relying upon Supreme Court precedent, in *Collins v. New York City Transit Authority*, the Second Circuit held that where, pursuant to a CBA, an employer's decision to terminate an employee is subject to the decision of an independent, neutral, unbiased arbitrator, based upon substantial evidence after a fair hearing, that decision is probative of the requisite causal connection between an employee's termination and the employer's alleged illegal motive.  *See* 305 F.3d 113, 119 (2d Cir. 2002) (citing *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 60 n.21 (1974) for proposition that determining how much weight to give a particular arbitration decision is left to the court's discretion and depends upon the facts and circumstances of each case).

Further, while "a negative arbitration decision rendered under a CBA does not preclude a

[discrimination] action by a discharged employee," an arbitration "decision by an independent

tribunal that is not itself subject to a claim of bias will attenuate a plaintiff's proof of the requisite

causal link.," and "to survive a motion for summary judgment," an employee/plaintiff claiming

discriminatory retaliation "*must present strong evidence* that the decision was wrong as a matter

of fact—e.g.[,] new evidence not before the [arbitrator]—or that the impartiality of the

proceeding was somehow compromised." *Id.* (citing *Gardner-Denver Co.,* 415 U.S. at 45-60, 60

n.21)(emphasis added).

In granting summary judgment in favor of a defendant/employer in a § 1981 retaliation

action and relying upon *Collins* in doing so, Judge Cogan rejected a plaintiff/employee's

argument that, because she had not asserted her retaliation claims in the arbitration proceeding,

the Court should not consider the subsequent arbitration decision upholding her termination. *See*

*Butler v. Coca-Cola Refreshments USA, Inc.*, No. 12-cv-1791, 2013 WL 3324995, at *9

(E.D.N.Y. July 1, 2013).  Judge Cogan stated that "[t]he case law is clear that the failure to raise

[employment discrimination] claims in the context of a labor arbitration does not deprive the

[arbitration] award of its evidentiary force under *Collins*." *Id.* (*citing Simpson v. N.Y.C. Dep't of*

*Civil Serv.,* No. 02-cv-1216, 2005 WL 545349, at *16 (N.D.N.Y. Mar.1, 2005) ("Under *Collins*

and its progeny, failure to address the discrimination issue in an arbitration does not diminish the

impact of that arbitration on a subsequent discrimination action.")).  Recognizing that the

arbitration decision did not have a preclusive effect on the plaintiff's retaliation claim, Judge

Cogan found that "the arbitrator's decision that plaintiff's termination was based on a legitimate

business reason complement[ed] the inadequacy of her proof of retaliatory motive." *Id.* (citing

*Collins,* 305 F.3d at 119); *see also Simpson*, 2005 WL 545349, at *16 (finding in an employment

discrimination and retaliation action, where a plaintiff "ha[d] not come forth with any evidence, let alon[e] 'strong evidence' . . . showing that his termination was wrong as a matter of fact" or "'strong evidence' that the 'impartiality of the arbitration was somehow compromised,'" that the arbitration decision was "*highly probative* of the *absence* of discriminatory intent' in plaintiff['s] termination" (quoting *Collins*, 305 F.3d at 119))(emphasis in *Simpson*); *Tomasino v. Mount Sinai Med. Ctr. & Hosp.*, Case No. 97-cv-5252, 2003 WL 1193726, at *12 (S.D.N.Y. Mar. 13, 2003) ("[I]n *Collins* the arbitration board's decision was relied on not as expressly dealing with the issues of race discrimination and retaliation, but as *providing persuasive findings about the employee's misconduct*." (emphasis added)).

### (*b*.)   The Subject Arbitration Decision

In the Arbitration Decision regarding Knight's termination, the Arbitrator found that even under the heightened "clear and convincing" standard of review requested by Knight, the County proved "by clear and convincing evidence" that Knight "knew or should have known his conduct on May 29 and June 1 was wrong." (*Id.* at 16.)  Specific to the Arroyo Incident, the Arbitrator found that Knight: cursed at Arroyo during the First and Second Stops (*see id.* at 17); failed to identify himself as a law enforcement officer (*see id.*); behaved in a manner which was "unusual making it more likely [Arroyo] thought [Knight] and Del Valle were not actually law enforcement officers, thereby raising Arroyo's threat level" (*id.*); and, "was angry and aggressive," engaging in threating behavior which caused Arroyo to "fear[] for her safety." (*Id.*) Bases upon Arroyo's "credible and consistent . . . testimony[,] even under strong cross-examination," which was "supported by the testimony of [Knight]'s partner Del Valle, who testified that [Knight] was angry and was cursing at Arroyo," (*id.* at 18), the Arbitrator found Knight "committed misconduct in his interaction with Officer Arroyo." (*Id.* at 16.)  Notably, the

Arbitrator found whether Arroyo was incorrect about Knight running the traffic light was not a

justification for Knight's actions; rather, what was of significance was Knight's "not even

inquir[ing] about what light Arroyo was referring to, or merely just accept[ing] her warning" but,

instead, choosing "to exit his vehicle and [to] repeatedly curse and yell at Arroyo, creating and

escalating an incident that never would have occurred otherwise." (*Id.* at 19.)  The Arbitrator

enumerated the instances of Knight's misconduct, *to wit*:

> In the first stop[, Knight] cursed at Arroyo and drove away
> although Arroyo had not indicated he could go.  In the second
> stop[,] he (1) got out of his vehicle, (2) approached Arroyo's
> vehicle, (3) approached Arroyo's vehicle by engaging in a tactical
> maneuver called slicing the pie, an aggressive act, (4) cursed
> repeatedly at Arroyo, including referring to her as "you fucking
> bitch," (5) refused Arroyo's repeated commands to get back into
> his vehicle, [and] (6) resisted Del Valle's efforts to deescalate the
> incident by continuing to curse and yell at Arroyo even as Del
> Valle was pushing [Knight] into the vehicle.

(*Id.* at 22.)  He concluded that Knight's actions during the Arroyo Incident, which occurred "on a

public street," while Arroyo "had her hand on her firearm," which, nonetheless, "did not deter"

Knight, "were egregious and potentially dangerous" putting his "safety and that of his partner,

Arroyo[,] and the general public at risk." (*Id.* at 22.)

Specific to the Cubicle Incident, the Arbitrator found Knight's behavior in confronting

Del Valle and questioning her about her reporting the Arroyo Incident to be misconduct based

upon the consistent, credible testimony of Del Valle, Mays and Torres[5] that during the

approximate five-minute confrontation, Knight was angry, verbally berating and intimidating

towards Del Valle.  (*See id.* at 20.)  In so finding, the Arbitrator rejected Knight's argument that

Del Valle was being pressured by her supervisors to report the Arroyo Incident, which Knight

---

[5] "All three testified credibly and consistently under strong cross-examination," which testimony
the Arbitrator found believable.  (*Id.* at 21.)

asserted undermined her testimony.  (*See id.* at 21-22.)  The Arbitrator found equally unavailing
Knight's contention that the supervisors' request for a report "exonerate[d] [him] of his
misconduct."  (*Id.* at 22 "[Knight]] engaged in misconduct on June 1 when he angrily berated
Del Valle for attempting to report the [Arroyo I]ncident.  [Knight]'s actions could reasonably be
interpreted by Del Valle and other co-workers who witnessed it that they should not report issues
with [Knight] to Supervisors.  This also constitutes misconduct.").)

Knight has not presented any evidence that the Arbitration Decision "was wrong as a
matter of fact . . . or that the impartiality of the [arbitration] proceeding was somehow
compromised," let alone the requisite "strong evidence" of same.  *Collins*, 305 F.3d at 119.  (*Cf.*,
Knight Statement, *in toto*; Additional Facts, *in toto*.)  Therefore, in accordance with *Collins* and
its progeny, the Decision is accorded probative weight in the Court's consideration of whether
there is a causal connection between Knight's termination and the County's alleged illegal
motive in imposing that termination, and Knight's objections to consideration of the Decision as
inadmissible evidence (*see* Knight Statement, *in passim*) are overruled.[6]

### 2.  Knight's First Cause of Action:  First Amendment Retaliation

"Where, as here, a plaintiff claims that he or she was retaliated against in violation of the
First Amendment, he or she must plausibly allege that '(1) his [or her] speech or conduct was
protected by the First Amendment; (2) the defendant took an adverse action against him [or her];
and (3) there was a causal connection between this adverse action and the protected speech.'"
*Montero v. City of Yonkers*, N.Y., 890 F.3d 386, 394 (2d Cir. 2018)(quoting *Cox v. Warwick*

---

[6]  Further, to the extent Knight objects to the Court's consideration of the Del Valle Report (*see*
Ex. D (ECF No. 27-7)) and Arroyo's report (*see* Ex. E (ECF No. 27-8)), those objections are
overruled since Knight has failed to show that the "source of the information" for the reports or
"other circumstances" about them indicate the reports lack trustworthiness.  *See* Fed. R. Evid.
803(6)(E).

*Valley Cent. Sch. Dist.*, 654 F.3d 267, 272 (2d Cir. 2011)).  Where a public employee speaks in the workplace "as a citizen . . . upon matters of public concern," he "may be protected from retaliation."  *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968); *see also Montero*, 890 F.3d at 395.  When presented with a First Amendment Retaliation claim by a public employee, a court must first determine whether the plaintiff/employee's speech was undertaken as a citizen regarding a matter of public concern and, if so, then assess whether the defendant/employer can establish that it "had an adequate justification for treating the employee differently [based on his or her speech] from any other member of the general public."  *Garcetti v. Ceballos*, 574 U.S. 410, 418 (2006) (citing *Pickering*, 391 U.S. at 568).  If, however, a public employee makes a statement pursuant to his official duties, he is not speaking as a public citizen for First Amendment purposes, and, under such a scenario, "the Constitution does not insulate [the employee's] communications from employer discipline."  *Montero*, 890 F.3d at 395 (quoting *Garcetti*, 574 U.S. at 421).  When determining whether an employee's speech addresses a matter of public concern, a court must examine the "content, form, and context of a given statement, as revealed by the whole record."  *Connick v. Myers*, 461 U.S. 138, 147-48 (1983) (further noting that "[t]he inquiry into the protected status of speech is one of law, not fact").

The County argues that Knight did not engage in speech undertaken as a citizen regarding a matter of public concern since any alleged protected speech to Del Valle was expressed "in defense of his being pulled over" (Support Memo at 7; *see also id.* at 7-8 ("Knight was upset that he was pulled over by an officer of a separate municipality for running a red light while he was on duty as a law enforcement officer . . . .")) and such alleged speech to Goldberg was "in response to being disciplined for that incident" (*id.* at 8 ("Knight's comments were motivated by him being notified he was being terminated.")).  Thus, the County maintains, since Knight's

speech was personal in nature, it does not warrant First Amendment protection.  (*See id.* (relying upon, *inter alia*, the Arbitration Decision as evidence that "the only factors in [Knight]'s termination were his behavior and actions towards Officer Arroyo and Officer Del Valle"); *see also* Reply at 4 (arguing "Knight is unable to establish that he spoke as a citizen on a matter of public concern").)

Relying upon a case challenging the constitutionality of New York City's "stop-and-frisk" policy pursuant to the Fourteenth Amendment, Knight contends that "[s]peaking about systemic racial-profiling in law enforcement departments is a matter of public concern."  (Opp'n at 21 (discussing and quoting *Floyd v. City of N.Y.*, 959 F. Supp.2d 540, 660-61 (S.D.N.Y. 2013).)  Since he "was not speaking about the racist and unconstitutional problem of systemic racism [in police departments] to get out of a ticket, get out of disciplinary trouble, or for any other personal benefit" (*id.* at 21-22), Knight argues his speech about same was public and, therefore, protected.  (*See id.* at 22.)  Knight indicates two instances of alleged First Amendment protected speech, *i.e.*, "comments about systemic racism [made] in a donut shop *before* any incident occurred" (hereafter, the "First Comments") and "[h]is second comment that the L[ong] B[each] P[olice] D[epartment] pull-overs were an example of racist policies [which] came days *after* the [Arroyo Incident] . . . and before he knew about the [Probation D]epartment's intent to investigate" (hereafter, the "Second Comments") (*id.* at 22 (emphases in original)), expressed when he "had no personal interest at-stake."  (*Id.*)  Finally, Knight maintains that since these incidents of alleged protected speech and his termination occurred within a month's time, for

*prima facie* purposes, he has established the requisite causation prong of his First Amendment retaliation claim.[7]  (*See id.*)

As noted, the Court's threshold determination regarding Knight's First Amendment retaliation claim is determining whether his alleged speech was made while acting as a private citizen addressing a public concern, *i.e.*, racism in and racial profiling by police departments. That analysis is limited to the two incidents identified by Knight in his Opposition.

(*a.*)  *The First Comments*

Knight has not provided any citation to the record or identified the date when the First Comments were made or to whom, thwarting the Court's ability to examine the "content, form, and context" of those alleged First Comments to determine if they warrant constitutional protection.  *See Connick*, 461 U.S. at 147-48; *cf., generally, Raymond v. City of N.Y.*, 317 F. Supp.3d 746, 778 (S.D.N.Y. 2018)(in denying a motion to amend, finding plaintiff's "pleading is vague and lacks specificity as to when and to whom within the NYPD he complained 'regarding the quota and the unfair punishment for not meeting the quota,' precluding the requisite assessments of whether he was speaking as a citizen on a matter of public concern and whether there was any causal link to the allegedly retaliatory measures").  Even assuming, *arguendo*, that Knight was referring to the comments he made to Del Valle about racial profiling within police departments (*see, e.g.,* Knight Depo. Tr. 62:18-64:5), which could be a matter of public concern, *see, e.g., Cotarelo v. Village of Sleepy Hollow Police Dep't*, 460 F.3d 247, 252 (2d Cir. 2006)

---

[7]  While "[m]ere temporal proximity between a plaintiff's protected activity and an adverse employment action is sufficient to create an inference of retaliation for purposes of proving a *prima facie* case[,] . . . *temporal proximity, without more, 'is insufficient to satisfy [the plaintiff's] burden to bring forward some evidence of pretext' at the third stage of the McDonnell Douglas inquiry*."  *Aka v. Jacob K. Javits Convention Ctr.,* No. 09 Civ. 8195, 2011 WL 4549610, at *9 (S.D.N.Y. Sept. 30, 2011) (internal citations omitted; emphasis added).

(stating the Circuit Court has "repeatedly held that discrimination in a government workplace is a matter of public concern")(citing *Konits v. Valley Stream Cent. High Sch. Dist.,* 394 F.3d 121, 125 (2d Cir.2005); *Mandell v. County of Suffolk,* 316 F.3d 368, 383 (2d Cir.2003)); *see also Feingold v. New York,* 366 F.3d 138, 160 (2d Cir.2004), he cannot sustain his First Amendment retaliation claim based upon those comments because: Knight did not establish that he was acting as a private citizen when he expressed concern about racism to Del Valle or that he intended the First Comments to be publicly disseminated in furtherance of civic discourse, *see, e.g.*, *Frisenda v. Inc. Village of Malverne*, 775 F. Supp.2d 486, 507 (E.D.N.Y. 2011) (quoting *Garcetti,* 547 U.S. at 422)); Knight has not shown that Del Valle had any supervisory or decision-making authority over him (*cf., e.g.*, Additional Facts, ¶51 (stating Del Valle was a "fellow probation [o]fficer" (citing Knight Depo. Tr. 11:17-12:14))) and, therefore, could have authorized Knight's termination in retaliation for vocalizing his concerns about racism; and, Knight has not presented any evidence that Del Valley conveyed the First Comments to anyone, let alone, persons in authority (*cf., e.g.*, Del Valle Report, Ex. D (ECF No. 27-7) (failing to report any comments or complaints Knight made regarding racism or racial profiling)) such that they could have acted upon it in an illegal retaliatory manner.  (*See also infra* at Part III(B)(4)(a) (discussing lack of causal connection between the First Comments (referred to as the Del Valle Complaint) and Knight's termination).)  In sum, based upon the alleged First Comments, as presented and argued by Knight, no rational fact-finder could find for him on his First Amendment retaliation claim; thus, with "no genuine issue for trial," the County is entitled to summary judgment as a matter of law on this branch of Knight's First Cause of Action.  *See Ricci*, 557 U.S. at 586.

(*b.*)  *The Second Comments*

Knight has failed to identify the Second Comments with any specificity.  Other than a

vague reference to making them "days *after* the traffic stop . . . and *before* he knew about the

department's intent to investigate" (Opp'n at 22), there is little else in the way of "content, form,

and context" with which the Court can analyze the Second Comments to determine if they

warrant constitutional protection.  *See Connick*, 461 U.S. at 147-48.  Unadorned statements

without the benefit of citation to competent evidence is insufficient to defeat summary judgment.

*See* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed

*must support the assertion* by citing to particular parts of materials in the record . . . ." (emphasis

added)); *see also Frisenda*, 775 F. Supp.2d at 503 (stating that "[w]here . . . a public employee

brings a retaliation claim based on the First Amendment, a plaintiff *must put forth evidence* . . .

demonstrate[ing] . . . a *prima facie* case" (emphasis added)).  In any event, the Court's review of

the record shows that, while Knight claims to have verbally complained about the Arroyo

Incident on June 1, there is no indication those complaints included raising his concerns about

racial profiling:

> Q:  Following the incident with the Long Beach Police
> Department Officer Arroyo, did you speak with anybody or
> complain at all about the incident to any of your
> coworkers?
> A:  I spoke to my supervisor that Monday, I reported it to her,
> but she told me that she already knew about it.  I spoke to
> the union, Lenny Tucker[.]  I spoke to Marla Rowe, and
> Officer Fisher who told me that she heard what happened
> and that everybody knew in the office what happened.
> That was June 1st.
> Q:  So everybody knew, nobody wanted to hear your story?
> A:  Everybody knew - -
>     * * *
> A:  Well, a lot of people, my coworkers, were aware of the
> situation, *but nobody in management or administration
> heard any type of version of my story from me*.  They heard

> maybe from Delvalle and Officer Arroyo.  They never
> heard my story.  To this day they never heard my story.

(Knight Depo. Tr. 75:15-76:16 (emphasis added).)  Even assuming, *arguendo*, that the Second

Comments were those allegedly made to Goldberg on June 1 or 2, they would not be entitled to

constitutional protection because they were related to his employment, in which he had a

personal stake, *i.e.*, defending his conduct in response to Del Valle's report of the Arroyo

Incident, and not as a private citizen.  *See, e.g.*, *Frisenda*, 775 F. Supp.2d at 508-09 (analyzing

whether a public employee speaks as a private citizen entitled to First Amendment protection).

Nor is there anything in the record indicating that the alleged Second Comments were intended

to be disseminated outside Knight's workplace in some attempt to "make a 'contribution[] to

civic discourse.'"  *See id. at* 507 (quoting *Garcetti*, 547 U.S. at 422)).  Thus, even if spoken,

upon the record evidence, Knight has failed to establish that the Second Comments were made

by one acting as a private citizen; this failure precluded Knight from establishing his First

Amendment retaliation claim.  (*See also infra* at Part III(B)(4)(b) (discussing lack of causal

connection between the Second Comments (referred to as the Goldberg Complaint) and Knight's

termination).)  Accordingly, the County is entitled to summary judgment as a matter of law on

this branch of Knight's First Cause of Action.

### 3. Knight's Second Cause of Action:  Due Process Violation

"In order to assert a violation of procedural due process rights, a plaintiff must 'first

identify a property right, second show that the [government] has deprived him of that right, and

third show that the deprivation was effected without due process.'"  *Doe v. U.S. Merchant*

*Marine Academy*, 307 F. Supp.3d 121, 149 (E.D.N.Y. 2018) (quoting *Local 342, Long Island*

*Pub. Serv. Emps., UMD, ILA, AFL-CIO v. Town Bd. of Huntington*, 31 F.3d 1191, 1194 (2d Cir.

1994)(modified in *Doe*).  "Ordinarily, the due process clause of the Fourteenth Amendment

requires that a state or local government afford persons 'some kind of a hearing' prior to

depriving them of a significant liberty or property interest." *Locurto v. Safir*, 264 F.3d 154, 171

(2d Cir. 2001)(citations omitted).  When a public employee with a property interest in his

employment is terminated, "procedural due process is satisfied if the government provides notice

and a limited opportunity to be heard prior to termination, *so long as a full adversarial hearing is*

*provided afterwards*." *Id.* (citing *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 545-46

(1985))(emphasis added).

The extent of Knight's argument in support of his Second Cause of Action is that: the

County "knew of the [Arroyo I]ncident and had begun the investigation into the matter as of June

1, 2015;" "he was terminated on June 29, 2015;" and, while "[t]he investigators contacted fellow

coworkers and . . . officers in the [Long Beach Police Department] . . . nobody ever took down

[his] version of the events—let alone apprised [him] of the charges and evidence against him."

(Opp'n at 23 (without citation to the record).)  There is no dispute that Knight had a property

interest in his job and, by its termination of Knight's employment, the County deprived Knight

of that property interest; however, Knight is unable to show that that deprivation was effected

without due process, the third component of a procedural due process violation claim.

It appears that the basis for claiming a procedural due process violation is Knight's

contention that he was not provided any opportunity to be heard prior to his termination.

However, the record presented does not support this implicit argument.  In objecting to the

County's statement that at the Termination Meeting, "the Probation Department received

[Knight]'s version of the events that occurred on May 29, 2015" (County Statement, ¶28 (citing

Goldberg Depo. Tr., Ex. G (ECF No. 27-10) at 43)), Knight states, *inter alia*, "that he was never

presented with the charges or evidence against him *before relaying his version of the events*, and

the Defendant is implying he was given the charges and evidence against him *before relaying his story*." (Knight Statement, ¶28 (citing Knight Depo. Tr., Ex. C (ECF No. 27-6) 43:15-44:24 (emphasis added)).)  Notwithstanding that the cited portion of Knight's deposition testimony does not address the Termination Meeting,[8] this counterstatement undermines his argument of not having been provided any opportunity to be heard prior to his termination by tacitly admitting Knight did convey his version of the events before his termination.  (*See also* Knight Decl., Ex. 4 (ECF No. 29-4), ¶4(4) (declaring that during the Termination Meeting, he "complain[ed] to . . . Goldberg that Officer Arroyo was racist towards [Knight] by racially profiling [him] and that the termination, because of the racism, was not justified").)  Thus, contrary to his assertion, the County did afford Knight the requisite limited opportunity to be heard at the Termination Meeting prior to his termination.  *See Locurto*, 264 F.3d at 171.  This, in conjunction with the NOPA[9] (*see* County Statement, ¶36 (stating NOPA indicated that Knight was terminated for the Arroyo Incident), *with* Knight Statement, ¶36 ("Knight admits the NOPA identified that he was terminated for the [Arroyo Incident]")), and the full adversarial hearing provided to Knight (*cf.*, County Statement, ¶33 (stating "[t]he type of disciplinary process"

---

[8]  The cited portion addresses the Cubicle Incident, in particular, whether Knight banged or tapped on Del Valle's cubicle.

[9]  Notably, in addressing Knight's challenge to the notice of charges against him, the Arbitrator stated:

> In this case, the issue of notice goes to the underlying conduct –
> [Knight]'s behavior on May 29 and June 1.  I find [Knight] knew
> or should have known his conduct was wrong and would subject
> him to disciplinary penalties.  The County was not required to put
> [Knight] on specific notice prior that such conduct was
> impermissible, under the facts and circumstances of this case.  In
> short, [Knight] should have known better.

(Arbitration Decision at 23.)

provided Knight "involved a [NOPA] and a three-day hearing before an impartial arbitrator"),

*with* Knight Statement, ¶33 ("Admitted")), demonstrates that the procedural due process

provided to Knight comports with that which is required by law.  *See Locurto*, 264 F.3d at 171,

174.  Therefore, based upon the record presented, there is no genuine issue as to any material fact

regarding Knight's due process claim and, as a matter of law, the County is entitled to summary

judgment in its favor as to the Second Cause of Action.

    4.  <u>Knight's Fifth Cause of Action: § 1981 Retaliation</u>

"Retaliation claims are analyzed under the three-step *McDonnell Douglas* framework."

*Hernandez v. Int'l Shoppes, LLC*, 100 F. Supp.3d 232, 267 (E.D.N.Y. 2015)(citing *Treglia v.*

*Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) ("Claims for retaliation are analyzed under

the same burden-shifting framework established for Title VII cases.[10]"); further citation

omitted).

> If the plaintiff is able to establish a prima facie case of
> discrimination,[11] the burden then shifts to the defendant to set
> forth "some legitimate, nondiscriminatory reason" for the
> complained-of conduct.  *McDonnell Douglas*, 411 U.S. at 802; *see*
> *also Fincher* [*v. Depository Trust & Clearing Corp.*], 604 F.3d
> [712,] 720 [(2d Cir. 2010)] (stating that where the plaintiff
> succeeds in establishing a prima facie case, "then the presumption

---

[10]  Claims of retaliation pursuant to § 1981 are assessed using the same standards applicable to retaliation claims pursuant to Title VII.  *See Benn v. City of N.Y.*, No. 07-cv-326, 2011 WL 439495, at *5 (E.D.N.Y. Mar. 4, 2011), *aff'd*, 482 F. App'x 637 (2d Cir. May 23, 2012); *see also Fincher v. Depository Trust & Cleaning Corp.*, 604 F.3d 712, 720 (2d Cir. 2010); *Butler*, 2013 WL 3324995, at *5 ("The applicable standard for proving retaliation under 42 U.S.C. § 1981 is the familiar burden shifting test established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 . . . ." (citing *El Sayed v. Hilton Hotels Corp.,* 627 F.3d 931, 932-33 (2d Cir. 2010)).

[11]  An employee/plaintiff meets his retaliation *prima facie* burden when he establishes: (1) engagement in a protected activity; (2) his employer's awareness of the activity; (3) that the employer took adverse employment against the plaintiff; and (4) a causal connection between the alleged adverse action and the protected activity.  *See Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 608 (2d Cir. 2006); *Borski v. Staten Island Rapid Transit*, 413, F. App'x 409, 410-11 (2d Cir. 2011).

> of retaliation arises and the employer must articulate a legitimate,
> non-retaliatory reason for the action that the plaintiff alleges
> was retaliatory").  Where the defendant articulates such a reason, the
> burden shifts back to plaintiff to establish that "but for the
> protected activity, [she] would not have been terminated."  *Moore
> v. Kingsbrook Jewish Med. Ctr.*, No. 11-CV-3625 (MKB), 2013
> WL 3968748, at *14 (E.D.N.Y. July 30, 2013); *see also Univ. of
> Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534
> (2013)(stating that a plaintiff "must establish that his or her
> protected activity was a but-for cause of the alleged adverse action
> by the employer.").

*Graham v. Three Village Cent. Sch. Dist.*, No. 11-cv-5182 (JFB), 2013 WL 5445736, at *21

(E.D.N.Y. Sept. 30, 2013) (first set of brackets added).

> A plaintiff may prove that retaliation was a but-for cause of an
> adverse employment action by demonstrating weaknesses,
> implausibilities, inconsistencies, or contradictions in the
> employer's proffered legitimate, nonretaliatory reasons for its
> action.  From such discrepancies, a reasonable juror could
> conclude that the explanations were a pretext for a prohibited
> reason.  "But-for" causation does not require proof that retaliation
> was the only cause of the employer's action, but only that the
> adverse action would not have occurred in the absence of the
> retaliatory motive.

*Dudley v. N.Y.C. Hous. Auth.*, No. 14-cv-5116, 2017 WL 4315010, at *19 (S.D.N.Y. Sept. 25,

2017)(quoting *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013); internal

citations and quotation marks omitted).

The County contends that Knight cannot make out a *prima facie* case of retaliation,

asserting that Knight "did not participate in any protected activity that management was aware

of," and that if Knight made comments to Del Valle, she never mentioned them in her report on

the Arroyo Incident.[12]  (Support Memo at 12 (citing *Benn*, 482 F. App'x at 638).)  The County

---

[12]  The County avoided characterizing Knight's alleged comments to Del Valle as complaints of racism or of racial profiling.  (*See id.*)

further claims that Knight "is unable to assert a causal connection between any protected activity" and his termination since the "only time" Knight "alleged to his supervisor that [Arroyo] was a racist was when he was advised he was being terminated and served with the [NOPA]." (*Id.* (citing Goldberg Depo. Tr. at 43, 62, and Knight Depo. Tr. at 70); *see also id.* at 13 (stating that "the first and only time that [Knight] told management that he felt he was racially profiled" was during the Termination Meeting and that "[h]e never told management previously").)  However, "[t]he termination decision was made prior to the [Termination M]eeting with the plaintiff; and prior to the plaintiff alleging he was racially profiled." (*Id.*) Thus, the County argues, Knight: "failed to adduce evidence sufficient to permit a jury to find that retaliation was a substantial reason for his termination;" "is unable to point to evidence that would be sufficient to permit a rational factfinder to conclude" the decision to terminate him "was motivated by impermissible reasons;" and "cannot establish that the real reason for his termination was retaliation." (*Id.* at 14.)

Knight identifies three verbal complaints "about perceived systemic racism and about perceived racial profiling" which he alleges he made and which he claims to be protected, *to wit*, his: May 29, 2019 complaint to Del Valle (hereafter, the "Del Valle Complaint"[13]); complaint to Goldberg on or around June 1or 2, 2015 (hereafter, the "Goldberg Complaint"[14]); and, speaking to Goldberg "about perceived racism" during the Termination Meeting (hereafter, the "Termination Complaint"; collectively with the Del Valle Complaint and the June 1 Goldberg Complaint, the "Alleged Protected Activities").  (*See* Opp'n at 5; *see also id.* at 24 (discussing "three instances of verbal protected activity complaining about perceived racism in police

---

[13]  Previously referred to as the "First Comments."  (*See supra*, Part III(B)(2).)

[14]  Previously referred to as the "Second Comments."  (*See supra*, Part III(B)(2).)

departments occurring within a month . . . of his termination"); Knight Statement, ¶46 (disputing

the County's Statement, ¶46, that he "did not *file* an internal EEO complaint alleging

discrimination" (emphasis added), asserting "he filed at least three *verbal* complaints of racism"

(emphasis added) (citing Knight Decl. ¶6)).)  He challenges the legitimacy of his termination on

the bases of the Arroyo Incident, arguing "the disputed record would allow a reasonable

factfinder to discredit this justification and to find retaliation was the real reason for his

termination." (*Id.* at 24.)  Knight raises four arguments supporting his position.

First, relying upon non-binding Tenth Circuit precedent, Knight claims that the County's

reason for terminating him is incredible as evidenced by the County's supposedly overcharging

him, presumptively referring to the NOPA, which raised six charges against Knight.  (*See id.* at

25 (citing *Tyler v. RE/MAX Mountain States, Inc.*, 232 F.3d 808, 814 (10th Cir. 2000); and,

*Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1310-11 (10th Cir. 2005).)  He argues that

"[t]he Arbitration [Decision] belies the Defendant's purported business justification because it

tends to indicate the Defendant trumped[ ]up charges against Knight, and all the charges failed

except for the most banal and benign catch-all charge imaginable," and that this "everything but

the kitchen sink" approach raises "a jury question as to whether the purported flimsy justification

that stuck is valid or is pretext." (*Id.*; *see also id.* at 26 (proffering the Arbitration Decision "as

persuasive evidence that undermines the credibility of the Defendant" since the Arbitrator upheld

only one of the six charges brought against Knight).)

Second, Knight attacks the validity of the Defendant's investigation, calling it "a sham"

because it "fail[ed] to take the principal subject's version of events[.]" (*Id.*)  In the absence of

any supporting case law, he baldly posits "[a] factfinder would infer that this shoddy

investigation was covering for a pre-formed conclusion." (*Id.*)

Third, Knight asserts that the absence of contemporaneous documentation of the Arroyo

Incident, *e.g.*, a ticket, citation, summons, or independent internal incident report, undermines the

alleged legitimacy of the County's reason for terminating him.  (*See id.* at 27.)  He also questions

the timing of Arroyo's incident report, which was submitted two weeks after the Incident and

after requested by the Defendant, calling it suspect and a basis for questioning the legitimacy of

the County's articulated motive.  (*See id.*)

Finally, Knight argues that "[t]he Defendant's purported motivations and actual actions

do not jive and are inconsistent," thereby presenting a disputed fact which cannot be resolved

upon a summary judgment motion.  (*Id. see also id.* at 28.)  This argument is premised upon the

notion that if Knight, an employee authorized to carry a gun by Defendant, "was so dangerous,"

the County should have immediately suspended him, but it did not.  (*Id.*; *see also id.* at 28

("Under no reasonable option would a Defendant—who *actually* believed Knight was a risk—

permit a proverbial loose-cannon to carry a gun in the entity's name for a month." (emphasis in

original)).)  Since this "commonsense action[]" was not taken by the County, Knight asserts this

scenario raises an open factual dispute regarding the County's actual motive in terminating him.

(*See id.* at 28.)

To begin, Knight correctly states his burden in establishing that the County's articulated

reason for his termination is a pretext.  (*Cf., e.g.*, Opp'n at 28 (recognizing need to establish 'but

for' cause for retaliation claim (citing *Kwan*, 737 F.3d 834)), *with* County's Support Memo at 14

("The plaintiff has failed to adduce evidence sufficient to permit a jury to find that retaliation

was a substantial reason for his termination.").)  In 2013, the Second Circuit explained that "[t]he

Supreme Court recently held that a plaintiff alleging retaliation in violation of Title VII must

show that retaliation was a 'but-for' cause of the adverse action, and *not simply a 'substantial' or*

'motivating' factor in the employer's decision." *Kwan*, 737 F.3d at 835 (citing *Nassar*, 133 S. Ct. at 2526, 2533)(emphasis added).  It further elucidated that "'but-for' causation does not require proof that retaliation was the only cause of the employer's action, . . . only that the adverse action would not have occurred in the absence of the retaliatory motive." *Id.* at 836 (emphasis added). In accordance with *Kwan*, the Court now assesses each Alleged Protected Activity Knight claims to have engaged in to determine whether it presents an issue of material disputed fact requiring resolution by a jury.

(*a.*)  *The Del Valle Complaint*

Even assuming, *arguendo*, that Knight complained to Del Valle about racism prior to the Arroyo Incident (*see* Knight Statement, ¶46 (disputing County's Statement that Knight "did not file an internal EEO complaint alleging discrimination," alleging he "filed at least three verbal complaints of racism" (citing Knight Decl., ¶6)), the Del Valle Complaint is not protected activity since: (1) by Knight's own testimony, the record evidence shows Del Valle was not in a position of authority (*see* Additional Facts, ¶51 (stating Del Valle was a "fellow probation [o]fficer" (citing Knight Depo. Tr. 11:17-12:14))); and, (2) there is no evidence that Del Valle conveyed the Del Valle Complaint to management making it was aware of that Complaint.  (*See, e.g.*, Del Valle Report, Ex. D (ECF No. 27-7) (failing to mention any complaints by Knight of racism or racial profiling).)  Given these shortcomings, Knight cannot make a *prima facie* case of retaliation based upon the Del Valle Complaint.  *See, e.g., Benedith v. Malverne Union Free Sch. Dist.*, 38 F Supp.3d 286, 322-23 (E.D.N.Y. 2014) (finding plaintiff/employee could not make out a *prima facie* retaliation claim where there was "no indication that the [defendant/employer] was made aware of the protected activity").

(*b.*)  *The Goldberg Complaint*

There is no dispute that Goldberg was in a position of authority at the Probation

Department.  (*Cf.*, Additional Facts, ¶¶72, 73 (stating Goldberg was the Assistant Probation

Director and "had authority over all the employees, including Mr. Knight"), *with* Reply

Statement, ¶¶72, 73 (admitting additional facts regarding Goldberg).)  The issue is whether

Goldberg learned of Knight's complaints of racism and racial profiling on June 1 or 2, 2015, *i.e.*,

was the Defendant aware of this Alleged Protected Activity prior to terminating Knight.

In his Additional Facts, Knight states, *inter alia*, that he "complained to . . . Goldberg that

he believed Officer Del Valle and himself [*sic*] were pulled over because of racism *before* the

[June 29th] termination meeting . . . ."  (Additional Facts, ¶71 (citing Knight Depo. Tr. 62:18-

64:5; Goldberg Depo. Tr. 61:10-62:16; and, Knight Decl., ¶4)(emphases in original).)  The

County disputes that claim.  (*See* Reply Statement, ¶71.)

Examination of the evidence Knight proffers in support of his claimed Goldberg

Complaint demonstrates his claim is faulty.  The portion of his deposition testimony during

which Knight conveyed his belief that "there is a lot of discrimination within the police

department," does not contain any mention of Goldberg, let alone Knight complaining to

Goldberg about racism or racial profiling.  (Knight Depo. Tr. 63:12-13; 62:18-64:5.)  "'[W]here

the cited materials do not support the factual assertions in the Statements, the Court is free to

disregard the assertion.'"  *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73-74 (2d Cir. 2001)

(quoting *Watt v. N.Y. Botanical Garden*, No. 98-cv-1095, 2000 WL 193626, at *1 n.1 (S.D.N.Y.

Feb. 16, 2000); further citations omitted), *abrogated on other grounds by Gross v. FBL Fin.*

*Servs., Inc.*, 557 U.S. 167 (2009).  Moreover, further review of Knight's deposition shows he

never testified about making the Goldberg Complaint.  Arguably, the closest testimony in that

regard is when, in response to his counsel's inquiry about being asked by anyone in authority to provide his "side of the events, [his] side of the story," Knight testified:

> A.    Absolutely nobody within the Probation Department asked me for any version of the story.
> Q.    And so you never wrote down your version and gave it to them - -
> A.    No.
> Q.    - - for review?
> A.    No.
> Q.    *And you <u>never</u> verbally did so either?*
> A.    *No.*

(Knight Depo. Tr. 70:20-71:6 (emphases added).)

Knight then proffers Goldberg's testimony as evidence that the Defendant was aware of Knight's Goldberg Complaint.  Asked whether he "ever heard that Mr. Knight was complaining that the reason he was pulled over by the Long Beach police officer in the first place was because h[e] and [Del Valle] were profiled," Goldberg testified:

> A.    Not in specific terms, no.
> Q.    In what terms did you hear?
> A.    Well, when he said the police officer was racist, I don't remember him going into specifics about why she was racist.  I don't remember him saying she pulled me over because I was black.  I don't remember him saying anything like that to me.
> Q.    But you do remember him complaining that the officer was racist?
> A.    Yes.  I remember that clearly because I pointed out to him that the officer was a person of color.
> Q.    *<u>That was during the termination meeting</u>.  Had you ever heard before the termination meeting[,] where you informed Mr. Knight that he was terminated, <u>did you ever hear before that of him complaining about that</u>?*
> A.    *I don't recall.  I'm trying to remember if I had a meeting with him prior to the termination meeting and <u>I really don't recall</u>.  There was so much going on that day or the two days that followed, however long it took.*

(Goldberg Depo. Tr. 61:15-62:16 (emphases added).)  This proffered portion of Goldberg's

deposition testimony is not sufficiently probative of Knight's claim and, therefore, is insufficient

to establish a disputed material fact that would preclude granting summary judgment, *see, e.g.,*

*Anderson*, 477 U.S. at 249-50; *Miner*, 541 F.3d at 471, especially in light of Goldberg's further

testimony of his "[c]lear recollection" of getting Knight's version of the Arroyo Incident during

the Termination Meeting.  (Goldberg Depo. Tr. 43:15-44: 2 (testifying further that Knight's

version of the Arroyo Incident provided during the Termination Meeting "was very succinct,"

with Knight stating Arroyo was "wrong" and a "racist," and that he did anything wrong).)

Finally, Knight cites to his post-deposition Declaration in support of the Additional Fact

that he allegedly complained to Goldberg of racism before the Termination Meeting, specifically,

his statement that:

> [o]n or around June 1, 2015, I mentioned to ADD Goldberg that I
> believed my being pulled over on May 29, 2015 was because
> Officer Arroyo is racist.  I do not remember Goldberg's specific
> response, but I remember that Goldberg did not tell me to put it on
> paper—like he had before—and neither he nor anyone else ever
> followed-up about my compliant of Arroyo's racist behavior.

(Knight Decl., ¶4 (without citation).)  However, this unadorned declaration is ineffective to

defeat summary judgment because:

> a party may not create an issue of fact by submitting an affidavit in
> opposition to a summary judgment motion that, by omission or
> addition, contradicts the affiant's previous deposition testimony.
> *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d
> Cir. 1969)(examining omission in four-day deposition); *Martin v.
> City of New York*, 627 F. Supp. 892, 896 (E.D.N.Y.
> 1985)(examining direct contradiction between deposition and
> affidavit).  "If a party who has been examined at length on
> deposition could raise an issue of fact simply by submitting an
> affidavit contradicting his own prior testimony, this would greatly
> diminish the utility of summary judgment as a procedure for
> screening out sham issues of fact."  *Perma*, 410 F.2d at 578.  Thus,

> factual issues created solely by an affidavit crafted to oppose a
> summary judgment motion are not "genuine" issues for trial.  *Id.*

*Hayes v. N.Y.C. Dep't of Corrs.*, 84 F.3d 614, 619 (2d Cir. 1996); *see also Cleveland v. Policy*

*Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999)("[A] party cannot create a genuine issue of fact

sufficient to survive summary judgment simply by contradicting his or her own previous sworn

statement . . . without explaining the contradiction or attempting to resolve the disparity.");

*Patacca v. CSC Holdings*, LLC, No. 16-cv-679, 2019 WL 1676001, at *14 (E.D.N.Y. Apr. 17,

2019)(rejecting plaintiff's reliance on post-deposition declaration to thwart summary judgment

where plaintiff had opportunity to raise proffered issue in earlier deposition, but did not); *Pierre*

*v. Hilton Rose Hall Resort & Spa*, No. 14-cv-3790, 2016 WL 4742281, at *10 (E.D.N.Y. Sept.

12, 2016)(finding plaintiff unable to produce competent evidence to defeat defendant's summary

judgment motion where plaintiff's affidavit contradicted his deposition testimony); *Vuona v.*

*Merrill Lynch & Co., Inc.*, 919 F. Supp.2d 359, 391 (S.D.N.Y. 2013) (finding that where

deponent had opportunity to address relevant issue during deposition, later declaration testimony

directly contradicting deposition testimony would not be considered in opposing summary

judgment); *Ciliberti v. Int'l Bhd. of Elec. Workers Local 3*, No. 08-cv-4262, 2012 WL 2861003,

at *11 (E.D.N.Y. July 10, 2012)(rejecting plaintiff's attempt to create disputed issues of fact via

affidavit, when his prior deposition testimony foreclosed any such disputes).  In his deposition,

Knight had the opportunity to raise the purported Goldberg Complaint as an Alleged Protected

Activity, but he did not.  In accordance with Second Circuit jurisprudence, the Court will not

now allow Knight to avoid summary judgment by relying upon his unsubstantiated post-

deposition declaration about the Goldberg Complaint in an attemp to create a factual issue,

especially when he fails to explain its absence from his deposition testimony.  *See, e.g., In re*

*World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 758 F.3d 202, 213 (2d Cir. 2014)

(holding a "plaintiff may not create material issues of fact by submitting affidavits that dispute [his] own prior testimony" regarding issues which have been thoroughly or clearly explored); *In re Fosamax Prods. Liab. Litig.*, 707 F.3d 189, 193 (2d Cir. 2013)(holding that a party is prohibited "from defeating summary judgment simply by submitting an affidavit that contradicts the party's previous sworn testimony"); *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) ("[F]actual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts her own prior deposition testimony."); *Buttry v. Gen. Signal Corp.*, 68 F.3d 1488, 1493 (2d Cir. 1995)("[I]t is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment." (quotations and citation omitted)).  In sum, on the record presented, Knight is unable to establish by competent evidence that he engaged in Alleged Protected Activity on June 1.  As a result, no *prima facie* case of retaliation is presented.

Moreover, as previously stated, the County's articulated reason for terminating Knight was his misconduct and behavior unbecoming of an officer during the Arroyo and Cubicle Incidents.  Knight has not provided evidence creating a material issue of fact demonstrating that the Defendant's reason for his termination was pretextual and that his Goldberg Complaint was the "but for" cause.  Further, "the arbitrator's decision that [Knight]'s termination was based on a legitimate business reason complements the inadequacy of h[is] proof of retaliatory motive." *Butler*, 2013 WL 3324995, at *9.  Additionally, Knight has failed to demonstrate any weakness, implausibility, inconsistency, or contradiction in this proffered legitimate, nonretaliatory reason for the County's action.  That absence, in conjunction with persuasive evidence afforded by Arbitration Decision that the reason for Knight's termination was his misconduct during the

Arroyo and Cubicle Incidents, leads to the conclusion that there was no discriminatory intent in the County's decision to terminate Knight. *See, e.g.*, *Simpson*, 2005 WL 545349, at *16 (finding that, in the absence of "any evidence, let alon[e] 'strong evidence' . . . showing that his termination was wrong as a matter of fact" or "'strong evidence' that the 'impartiality of the arbitration was somehow compromised,'" the arbitration decision was "'highly probative of the absence of discriminatory intent' in [plaintiff's] termination" (quoting *Collins*, 305 F.3d at 119)).

Nor do any of Knight's arguments attacking the legitimacy of the County's articulated, nondiscriminatory reason for terminating him carry weight.  Knight's "kitchen sink" argument is unpersuasive especially since it relies upon Tenth Circuit cases that are distinguishable and did not involve prior arbitration awards providing persuasive findings about an employee's misconduct, *see Jaramillo*, 427 F.3d at 1311-12 (addressing argument that defendant/employer's changed reason for its adverse action raised a triable issue of fact); *Tyler*, 232 F.3d at 814 (holding evidence supported jury's determination that franchisor's reasons supporting denial of applicant were pretext for discrimination).  Any perceived deficiencies in the County's investigation of the Arroyo and Cubicle Incidents were sufficiently rectified through the arbitration process, especially since Knight was able to present his version of the Incidents through that process.  (*See, e.g.*, Arbitration Decision at 3, 23-24.)  Moreover, the lack of contemporaneous documentation by Arroyo of her stops of Knight is inconsequential and does not "serve as evidence that tends to undermine the Defendant's position" (Opp'n at 27), particularly since: Knight has not proffered evidence that Arroyo was required to issue such documentation for every stop in which she engaged, which would make non-issuance of same suspicious; and, there is sufficient persuasive evidence that the Arroyo Incident was more than a mere verbal exchange, as Knight contends.  (*See, e.g.*, Del Valle's Report, Ex. D (ECF No. 27-

7); Arbitration Decision at 24 ("I find [Knight] guilty of Charge 5 "Behavior unbecoming of an officer."  I find [Knight], while on-duty, cursing and yelling at a Police Officer for doing her job, including referring to her as 'you fucking bitch,' on a public street to be unbecoming.  In addition, angrily berating Del Valle for five minutes for reporting the incident to her superiors is unbecoming.  Under the facts and circumstances of *this* case, I find [Knight] knew or should have known this behavior was unbecoming of an officer." (emphases in original)).)  Finally, Knight's "lack of immediate suspension" argument is based on pure conjecture, as there is no evidence that the County "thought" or "believed" Knight to be "dangerous" or a "loose-cannon" or, that if such was the case, that the County was required to suspend Knight.  It is well-established that speculation and conjecture are insufficient to defeat summary judgment.  *See, e.g.*, *Federal Trade Comm'n v. Moses*, 913 F.3d 297, 305 (2d Cir. 2019) ("[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."); *Flores v. United States*, 885 F.3d 119, 122 (2d Cir. 2018) (stating "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment" (quotations, alterations and citations omitted)); *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) ("A court cannot credit a plaintiff's merely speculative or conclusory assertions.").

### (*c.*)  The Termination Complaint

While there is no dispute that Knight complained of Arroyo being a racist during the Termination Meeting, by its very timing, it is inconceivable that this Alleged Protected Activity could be the "but for" reason for his termination.  Knight testified that it was during the Termination Meeting, after he had been presented with the NOPA and informed that he was being terminates, that he complained about Arroyo being a racist.  (*See, e.g.,* Knight Depo. Tr.

34

43:15-44:24.)  Therefore, Knight's claim that the Termination Complaint was Alleged Protected Activity and, but for his engagement in that Activity that he would not have been terminated, is spurious.  This conclusion is buttressed by a careful examination of the NOPA, which shows that Department approval of Knight's termination was made three days prior to the June 29 Meeting and prior to the alleged Termination Complaint, and, therefore, further negates Knight's argument that the Termination Complaint was the "but for" reason for his termination.  (*See* NOPA, Ex. H (ECF No. 27-11), Part 2 (Department approval authorized June 26, 2015); *cf., id.* at Part 1 (indicating termination date was originally scheduled for June 26, 2015, *i.e.*, *before* the Termination Complaint).)  Therefore, the Termination Complaint fails to raise a triable issue of fact which would preclude granting summary judgment in the County's favor on Knight's Fifth Cause of Action.

\* \* \*

To the extent not expressly addressed, the Court has considered Knight's remaining arguments and finds them to be without merit.

IV.   <u>Conclusion</u>

Accordingly, IT IS HEREBY ORDERED that the County's Summary Judgment Motion is GRANTED; the Clerk of Court is directed to enter judgment in favor of the County and, thereafter, close this case.

The September 8, 2020 Telephonic Conference is marked off the Court's calendar.

SO ORDERED this 22nd day of July 2020 at Central Islip, New York.

/s/ *Sandra J. Feuerstein*

Sandra J. Feuerstein
United States District Judge